Joseph Alexander HARVILLE, by next of friends Steve and Ruth Harville; Steve Harville; Ruth Harville, Plaintiffs–Appellants,

v.

VANDERBILT UNIVERSITY, INC.; Seth J. Scholer; Suzanne Starling; Karen Crissinger, Defendants–Appellees.

No. 02–5077.

United States Court of Appeals, Sixth Circuit.

Aug. 27, 2003.

Joseph Alexander Harville, pro se, Indianapolis, IN, for Plaintiff–Appellant.

Steve Harville, pro se, Indianapolis, IN, for Plaintiff–Appellant.

Ruth Harville, pro se, Indianapolis, IN, for Plaintiff–Appellant.

Steven E. Anderson, Clisby Hall Barrow, Walker, Bryant & Tipps, Nashville, TN, for Defendants–Appellees.

Before KEITH and COLE, Circuit Judges, and WEBER, District Judge.*

## OPINION

COLE, Circuit Judge.

Plaintiffs–Appellants Ruth and Steven Harville, individually and on behalf of their minor child, Joseph Harville, filed suit against Defendants–Appellees Vanderbilt University ("Vanderbilt"), Dr. Seth Scholer, Dr. Karen Crissinger, and Dr. Suzanne Starling, alleging violations of their civil rights, and claims for medical malpractice, malicious prosecution, abuse of legal process, outrageous conduct, fraud, negligent misrepresentation, and emotional distress. As a result of various motions to dismiss and motions for summary judgment, only the medical malpractice claim against Scholer, Crissinger, and Vanderbilt proceeded to trial. At the close of trial, the jury found that neither Scholer nor Crissinger had deviated from the recognized standard of acceptable professional practice in their medical communities. Based on these findings, the district court entered judgment in favor of Scholer. Crissinger, and Vanderbilt. Plaintiffs' motion for a new trial was denied, and they now appeal pro se the judgment of the district court. Plaintiffs contend that the district court improperly: (1) excluded the testimony of Dr. Jay Gordon, who was to testify regarding the acceptable standard of care; (2) excluded medical opinion testimony from Vanderbilt physicians; (3) excluded testimony from a related juvenile court proceeding; and (4) refused to allow before the jury: (a) emotional distress claims, (b) outrageous conduct claims, (c) civil rights claims, (d) state law claims related to a report filed with the Department of Children's Services ("DCS"), and (e) Mrs. Harville's medical malpractice claim.

For the reasons that follow, we AFFIRM the judgment of the district court.

## I.

Joseph Harville was born on February 26, 1996, and has suffered from a variety of medical problems and illnesses since his birth. Joseph was born to a mother whose pregnancy was complicated by drug and alcohol abuse. As a result, Joseph suffered from Fetal Alcohol Effect. Shortly after his birth, he was placed in the care of

---

* The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

Steven and Ruth Harville, his maternal grandparents, who officially adopted him in March, 1998.

Before the age of two, Joseph was diagnosed at Arkansas Children's Hospital with failure to thrive. He was having difficulty gaining weight and, on February 23, 1998, underwent a surgical procedure known as a Nissen fundoplication and had a "g-tube" placed in his stomach so that he could be fed through a tube directly into his stomach.

After the family moved to Tennessee, Joseph's pediatrician, Dr. Kenny Lynn, referred Joseph to Vanderbilt University's Children's Hospital in April, 1998, where he was seen by Scholer, a pediatrician in Vanderbilt's referral clinic. Joseph was referred to Scholer by Lynn for evaluation of poor growth, developmental delay, and staring spells. At this visit, Mrs. Harville reported recent episodes of staring and rigidity spells, and also reported a history of reactive airway disease and sleep apnea. According to Scholer, Joseph appeared to be a normal, healthy boy whose medical course "did not make sense." Scholer states that Dr. Casey of Arkansas Children's Hospital confirmed that no diagnosis could be identified to explain Joseph's symptoms.

Scholer's affidavit states that he had a follow-up appointment with Joseph on May 12, 1998, at which Mrs. Harville told him that Joseph continued to have some occasional rigidity and staring spells and that he had occasional choking and gagging spells that are not always associated with feeding. Scholer's physical evaluation of Joseph, however, revealed "an alert toddler in no distress, and a weight gain of 11 ounces since his last visit." Joseph was also seen by three pulmonologists for evaluation of asthma, allergic rhinitis, and apnea. One of these pulmonologists, Dr. Hazinski, wrote, "In summary, Joseph looks good and once again his symptoms cannot be accounted for by physical examination."

Scholer also referred Joseph to Dr. Eric Pina–Garza for a neurology consult. Pina–Garza admitted Joseph to Vanderbilt on July 8, 1998, for electroencephalogram ("EEG") monitoring over a continuous seventy-two-hour period. Although Mrs. Harville reported two "spells" during this time, the EEG monitoring detected no seizure activity during the reported spells.

On June 23, 1998, Scholer saw Joseph again on a follow-up visit for his failure to thrive. At this visit, Joseph's "physical examination was relatively unchanged," and his weight had improved remarkably. Apparently due to an increasing concern that there was nothing medically wrong with Joseph, Scholer discussed Joseph with Starling, a Vanderbilt pediatrician who is an expert in child abuse. While Scholer's affidavit states that this discussion with Starling occurred "[a]fter the June 23, 1998 office visit," it does not state how long after the visit. Thus, the record is silent as to the exact date on which Scholer first suggested a concern about possible abuse.

On July 25, 1998, Mrs. Harville sent a letter to the Board of Directors of Vanderbilt University Hospital expressing great displeasure with the care that Joseph had been receiving at the hospital. The letter was especially critical of Scholer. Plaintiffs contend that the suggestion that Joseph was being maltreated was retaliation by Scholer for Mrs. Harville sending this letter. Scholer denies this accusation.

On September 23, 1998, Scholer sent a letter to Casey, who had been Joseph's primary care physician at Arkansas Children's Hospital, which stated in part, "I continue to be rather concerned about whether [Joseph] truly has an underlying medical disorder. However, I am very

wary to pursue a course along these lines unless all physicians he has seen agree that there is a strong possibility." Casey's letter in response stated, "It has been my impression and that of our clinical team that there were parent/child issues related to the etiology of this problem. We felt that we made no progress in impacting this during the time that we worked with this family."

Continuing to note a "disparity between the symptoms reported by Mrs. Harville and Joseph's physical examination," Scholer sent an e-mail on October 28, 1998, to five Vanderbilt specialists who participated in Joseph's care. The e-mail stated in part, "As I have had ongoing concerns about the disparity between Joseph's symptoms (per mother) and his overall well appearance ... I am asking for your assistance in assessing the likelihood that Joseph has any serious medical (non-behavioral) condition that might explain his symptoms." Dr. Stokes, a pulmonologist, replied, "I don't believe [Joseph] has significant asthma, but without seeing him at a time when he is having acute symptoms, I can't rule it out. Unfortunately, that seems to be a pattern for his complaints." A second doctor, Crissinger, replied, "Joseph has no evidence of GI disease.... I believe that Joseph's feeding problems are all behavioral." A third doctor, Dr. Tiller, noted that the likelihood that Joseph has any serious medical (non-behavioral) condition "appears slight.... I found very little in the literature with regard to fetal alcohol syndrome/effect and feeding problems." Upon receiving another email from Scholer, Tiller stated, "The likelihood [that Joseph's choking and gagging problems are due to fetal alcohol effect or any other genetic or metabolic disease] appears slight; most likely this is a behavioral problem."

Eventually, Scholer concluded that the most likely diagnosis for Joseph was that he was a victim of Munchausen Syndrome by Proxy ("MSBP"). Also referred to as Factitious Disorder by Proxy, MSBP is an illness in which a caregiver fabricates or induces symptoms in a child. This conclusion led to the presentation by Scholer of Joseph's case to the Child Abuse Referral and Evaluation ("CARE") committee at Vanderbilt on November 4, 1998. On November 17, 1998, Scholer sent a letter, co-signed by Starling, to DCS advising DCS of the CARE committee's findings of probable MSBP with respect to Joseph. On November 23, 1998. DCS sought and obtained a temporary custody order, and Joseph was removed from the Harville's home. Joseph was placed in the foster care of Clarice McNeal on November 24, 1998. As a result of a juvenile court hearing held on March 9, 1999, Joseph was transferred out of foster care back to the Harville home.

On January 5, 2001, the district court dismissed Plaintiffs' civil rights and abuse of process claims. With regard to the § 1983 civil rights claim, the district court found that Defendants were not state officials and were not alleged to be working in concert or conspiring with state officials. Regarding the abuse of process claim, the district court found that because abuse of process lies for the improper use of process after it has been issued, rather than for maliciously causing process to issue, Plaintiffs failed to state a claim. On March 5, 2001, the district court granted Defendants' motion for summary judgment with regard to the claims for fraud, negligent misrepresentation, malicious prosecution, and outrageous conduct, finding that Defendants possessed good-faith immunity under Tennessee law governing the reporting of potential child abuse cases. Finding that genuine issues of material fact existed regarding Plaintiffs' medical

malpractice claim, summary judgment was denied on this claim.

Plaintiffs designated substantial deposition testimony taken from physicians who practice at Vanderbilt for presentation at trial. Defendants objected to a significant portion of this testimony, arguing that Plaintiffs had attempted to make these physicians expert witnesses against their will and had violated the scheduling order as well as Rule 26, which governs the disclosure of expert witnesses. The district court painstakingly proceeded through each objection to various parts of each deposition, and excluded the sections of the depositions that were appropriately considered expert testimony, but admitted any fact testimony based on interactions with Joseph.

During trial, Defendants objected to the admissibility of expert testimony from Gordon, a specialist in pediatrics and pediatric nutrition practicing and teaching in Los Angeles, California. At his deposition, Gordon had testified that he believed that Scholer and Starling acted in bad faith in reporting Joseph's case to Tennessee authorities because they had not sufficiently excluded other possibilities and the suspicion of MSBP was not reasonably strong. Gordon had also stated in his deposition that Scholer and Starling "had a child presented, looking to them as if they should include [MSBP] on their differential diagnosis. But instead of including it in their differential diagnosis, they filed a complaint against the parents and had the child removed from the home. They didn't do—the doctors didn't do their job." The district court granted Defendants' request to voir dire Gordon outside the presence of the jury. During this voir dire, Gordon testified that his opinions in this case were based on his belief that the standard of practice in Nashville is similar to the standard in Los Angeles and that he believed in a national standard of care in pediatrics.

The district court found that an expert's knowledge of the national standard of care was insufficient to establish the requisite knowledge of the local standard under Tennessee law. Accordingly, while acknowledging that Tennessee law in this area is "tortuously harsh," the district court excluded Gordon's testimony.

After Defendants' Rule 50 motion for judgment as a matter of law on the underlying medical malpractice claim was denied by the district court, Defendants moved for judgment as a matter of law with respect to Plaintiffs' claims for emotional distress damages. The district court granted this motion, finding that Tennessee law requires expert medical or scientific proof for recovery for infliction of emotional distress.

At the close of trial, the jury found unanimously that neither Crissinger nor Scholer violated the applicable standard of care in the treatment of Joseph, thereby finding Vanderbilt free from liability as well.

## II.

### A. *Exclusion of Gordon's Testimony*

We review a district court decision to exclude expert testimony for abuse of discretion. *Conwood Co., L.P. v. United States Tobacco Co.*, 290 F.3d 768, 781 (6th Cir.2002).

■ Tennessee's medical malpractice statute states that the claimant's burden includes demonstrating "[t]he recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community" and that "the defendant acted with less than or failed to act with ordinary and

reasonable care in accordance with such standard." TENN.CODE ANN. § 29–26–115(a).

The Tennessee Supreme Court has recently held that a plaintiff in a malpractice action "must produce expert medical evidence to establish the standard of professional care in the community in which a defendant practices or in a similar community." *Robinson v. LeCorps,* 83 S.W.3d 718, 724 (Tenn.2002). Specifically, the court stated that a plaintiff's medical expert "must have knowledge of the standard of professional care in the defendant's applicable community or knowledge of the standard of professional care in a community that is shown to be similar to the defendant's community." *Id.* An expert's discussion of the applicability of a national standard may not substitute for evidence that establishes the requirements of the statute. *Id.*

Plaintiffs' contention that the standard of care at a tertiary facility such as Vanderbilt is therefore similar to the standard of care at a tertiary facility such as UCLA. with which Gordon was familiar, does not demonstrate the admissibility of Gordon's testimony. In *Robinson,* the plaintiff's expert had similarly testified that the applicable standard of care in Nashville "would be expected" to be equivalent to the national standard of care, that "there is no differentiation recognized in ... one locality as opposed to the other, certain locations comparable with Nashville ...," and that orthopaedic surgeons "would stand the same test and would be expected to have the same knowledge and to practice in very similar fashions by the American Board of Orthopaedic Surgeons." *Id.* at 724–25. Nevertheless, the Tennessee Supreme Court ruled that this expert's testimony was properly excluded because he did not relate a basis for his knowledge of the standard of care in Nashville or why

the standard of care in Nashville was similar to the community with which he was familiar. *Id.* at 725.

Accordingly, as a result of Tennessee's medical malpractice law prohibiting experts from relying on a national standard of care that has not been shown to apply to the local community, Gordon's testimony was properly excluded by the district court.

*B. Exclusion of Expert Testimony of Vanderbilt Physicians*

■ A district court's decision to exclude expert testimony for failure to comply with Federal Rule of Civil Procedure 26 is reviewed for an abuse of discretion. *King v. Ford Motor Co.,* 209 F.3d 886, 900 (6th Cir.2000). Plaintiffs contend that the district court erred in excluding certain portions of the designated deposition testimony of the following Vanderbilt doctors: Dr. Joseph Gigante, Dr. William Bernet, Dr. Regina Gruber, Dr. Ellen Clayton, Dr. Robert Vandervoort. Dr. George Tiller. and Dr. Suzanne Starling. Rule 26 requires parties to disclose expert witnesses prior to trial and issue reports regarding their testimony. FED. R. CIV. P. 26(a)(2)(B).

The district court did not abuse its discretion in excluding this testimony. As the district court recognized, the Seventh Circuit case of *Patel v. Gayes,* 984 F.2d 214 (7th Cir.1993), is directly on point. *Patel* confronted the issue of whether the testimony of two doctors who treated the plaintiff in the medical malpractice action needed to have been disclosed under Rule 26. *Id.* The *Patel* court noted that Rule 26 focuses on the substance of the testimony, rather than the status of the witness. *Id.* at 218. Accordingly, despite the fact that the two doctors had been involved in the treatment of the plaintiff, the court ruled that their testimony with regard to the

725

standard of care fell within the category of expert testimony that is required to be disclosed under Rule 26. *Id.*

Because the evidence that the district court excluded was expert testimony, Rule 26 disclosure was required. Plaintiffs failed to comply with the requirements of Rule 26. Federal Rule of Civil Procedure 37 states that a party that fails to disclose information required by Rule 26 is not, unless such failure is harmless, permitted to use as evidence any witness or information not properly disclosed. FED. R. CIV. P. 37(c)(1). Accordingly, the district court did not abuse its discretion in excluding this testimony.

## C. *Exclusion of Testimony from Juvenile Court Proceeding*

■ An evidentiary ruling regarding admission of testimony from a prior proceeding is reviewed for an abuse of discretion. *See Trepel v. Roadway Express, Inc.,* 194 F.3d 708, 716 (6th Cir.1999). Prior to trial, Plaintiffs filed a motion to permit the use of depositions and testimony taken in the juvenile case. Defendants opposed this motion, and the district court denied the motion. Plaintiffs assert that the exclusion of this testimony was improper.

Federal Rule of Evidence 804 provides for the admission of former testimony taken during a different proceeding "if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." FED.R.EVID. 804(b)(1).

DCS was the adversary to Plaintiffs in the juvenile court proceeding, and it is clear that DCS cannot properly be considered a predecessor in interest to Defendants. Moreover, the motive of DCS at the juvenile court proceedings, while antagonistic to Plaintiffs, was not sufficiently aligned with the interest of Defendants in the medical malpractice trial to permit the prior testimony to be admitted under Rule 804. Accordingly, the district court did not abuse its discretion in excluding the testimony from the juvenile court proceedings.

## D. *Exclusion of Other Claims*

■ We review the granting of motions to dismiss and motions for summary judgment de novo. *Gahafer v. Ford Motor Co.,* 328 F.3d 859, 861 (6th Cir.2003); *Spadafore v. Gardner,* 330 F.3d 849, 851 (6th Cir.2003). Plaintiffs' third-party claims for emotional distress were dismissed at the close of Plaintiffs' case for failure to provide expert proof. Under Tennessee law, in order to recover for emotional injuries suffered as a result of an injury to a third party, the claimed emotional injuries must be supported by expert medical or scientific proof. *Ramsey v. Beavers,* 931 S.W.2d 527, 532 (Tenn.1996). Because Plaintiffs provided no expert testimony regarding their emotional injuries. the district court was correct in dismissing this claim.

■ Defendants were properly granted summary judgment on Plaintiffs' claims of fraud, negligent misrepresentation, malicious prosecution and outrageous conduct because Defendants are immune from liability on these claims. Each of these claims is based upon the report of possible MSBP to DCS. Under Tennessee law, any person having knowledge of any child who is suffering from any physical or mental condition of such a nature as to reasonably indicate that it has been caused by abuse or neglect is required to report this harm to authorities. TENN.CODE ANN. § 37–1–403(a). An individual reporting such harm is presumed to be acting in good faith and is immune from liability, civil or criminal, that might otherwise be incurred or imposed for such action. TENN.CODE. ANN.

§ 37–1–410(a); *see also Bryant–Bruce v. Vanderbilt Univ.*, 974 F.Supp. 1127, 1139 (M.D.Tenn.1997). In order to deprive Defendants of this immunity, Plaintiffs must show, by clear and convincing evidence, that Defendants acted in bad faith. *Bryant–Bruce*, 974 F.Supp. at 1139.

The district court correctly noted that disagreements among experts as to whether Joseph actually suffered from MSBP do not constitute bad faith. Moreover, even if Defendants were negligent in their diagnosis, such a fact would not support the required finding of bad faith. *Id.* at 1140. Accordingly, the decision by the district court to grant summary judgment on these claims by Plaintiffs was proper.

Plaintiffs' § 1983 civil rights claim was dismissed by the district court on the ground that Defendants are not state actors. To be entitled to relief under § 1983, a plaintiff must show the deprivation of a federal right that occurred under color of state law. *Bier v. Fleming*, 717 F.2d 308, 310 (6th Cir.1983). In the present case, it is clear that none of the Defendants were acting under color of state law. Therefore, the dismissal of Plaintiffs' civil rights claim was proper.

█ Finally, Mrs. Harville's claim for medical malpractice was appropriately dismissed because there was no physician-patient relationship between her and any of the Defendants. *See Estate of Doe v. Vanderbilt Univ.*, 958 S.W.2d 117, 122 (Tenn.Ct.App.1997) (noting that a physician-patient relationship is a necessary element of a medical malpractice action).

### III.

For the foregoing reasons, we AFFIRM the judgment of the district court.