NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0599n.06
Filed: July 14, 2005

No. 04-3227

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LEVI MOHNEY, MARY MOHNEY and TIMOTHY MOHNEY, | ) ) ) | |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| USA HOCKEY, INC. a/k/a AMATEUR HOCKEY ASSOCIATION OF THE UNITED STATES, INC.; TOLEDO CHEROKEES JR. CLUB, INC. d/b/a TOLEDO CHEROKEES; CENTRAL STATES HOCKEY LEAGUE; NORTH AMERICAN JUNIOR HOCKEY; UNKNOWN REFEREES, PERSONALLY AND AS AGENTS AND EMPLOYEES OF USA HOCKEY, TOLEDO CHEROKEES, NORTH AMERICAN JUNIOR HOCKEY LEAGUE AND CENTRAL STATES HOCKEY LEAGUE; COOPER OF CANADA LIMITED n/k/a BAUER, INC.; JOFA FACE MASKS d/b/a KARHU USA, INC.; and JASON RENEGER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellants. | ) ) | |

Before: COLE and SUTTON, Circuit Judges; ZATKOFF, Senior District Judge.[*]

---

[*] The Honorable Lawrence P. Zatkoff, Senior District Judge for the Eastern District of Michigan, sitting by designation.

ZATKOFF, Senior District Judge. This case arises out of an unfortunate accident that has left a young man forever paralyzed. Plaintiff-Appellant Levi Mohney ("Mohney") was a 17 year-old hockey player on May 21, 1995, when he participated in a try-out hockey camp in Toledo, Ohio. On a contested icing play during a scrimmage, Mohney crashed into the boards and suffered a spinal injury rendering him a quadriplegic. Only Cooper of Canada Limited n/k/a Bauer, Inc. ("Bauer"), the manufacturer of the helmet worn by Mohney at the time of his injury, remains as a defendant in this case. Bauer filed several motions, including a motion to exclude Plaintiffs-Appellants' experts and a motion for summary judgment. Judge David A. Katz of the Northern District of Ohio (Western Division) granted Bauer's motions. Because there is no cause of action against Bauer, we must affirm.

## I. BACKGROUND

### A. Undisputed Facts

In August 1994, Mohney purchased a black Cooper SK 2000 helmet manufactured by Bauer. At the time the helmet was manufactured, Bauer was aware of a "Heads Up: Don't Duck" program that had been created to promote awareness of the prevention of spinal cord injuries, including the importance of the position of the head when approaching the boards to prevent such injuries. The following warning was imprinted on the back of the helmet at the time of purchase (and remains there today):

> Ice hockey is a collision sport which is dangerous. This helmet affords no protection for neck or spinal injury. Severe head, brain or spinal injuries, including paralysis or death, may occur despite using this helmet. Do not use this helmet if the shell is cracked or if the

2

interior padding is deteriorated. Read instructions carefully before wearing.

Mohney has stated that he never read the above warning on any of the hundreds of times he put the helmet on and took it off. The helmet did not have a warning or instruction concerning the type of mask that should be affixed to the helmet, nor was Mohney warned that only certain helmets and masks should be used together.

At some time between Mohney's purchase of the helmet and May 21, 1995, a mask manufactured by former defendant Jofa Face Masks d/b/a Karhu USA, Inc. ("Jofa")[1] was attached to the helmet using certain hardware, including screws, nuts and two "J-clips." It is undisputed that Bauer did not direct Mohney regarding the proper manner in which to attach a mask (or the appropriate type of mask to attach) to the helmet or the appropriate hardware to use to attach a mask. The helmet and mask in this case were not compatible and did not conform to relevant standards set forth by the American Society for Testing and Materials (the "ASTM Standards"). ASTM Standards provide that (1) a hockey face protector (mask) should not extend more than 19 millimeters from the front of the helmet, and (2) the upper part of the helmet shall follow the contour of the mask it is attached to and either overlap or be attached in such a manner that the helmet will assist in impact-force absorption. Mohney's mask extended 35 millimeters from the front of his helmet and the helmet and mask were asymmetrical.

On May 21, 1995, Mohney and another player chased a puck in an effort to prevent or

_____

[1]There were warnings attached to the mask when he got it, and Mohney states that he did not read those warnings.

3

effectuate an icing call, respectively. In doing so, they approached the boards with Mohney in front of the other player. The other player contacted Mohney from behind as Mohney skated (face) forward. Mohney struck the boards head first and, as a result, suffered an injury at the C5-C6 level which rendered him quadriplegic. The right-hand side J-clip was not present on the helmet after the incident and it was never recovered.

**B.      Summary of Parties' Arguments**

Plaintiffs maintain that Mohney kept his head up as he headed into the boards in order to avoid a blow to the crown (top) of the head, as he had been instructed to do throughout the years, because he knew that a serious spinal injury could result from going into the boards crown first. Plaintiffs assert that, with his head up, Mohney's head went face-forward into the boards as his body continued to move forward. As his face/the mask collided with the boards, Plaintiffs contend that, in a matter of milliseconds, (1) the J-clip on the right-hand side holding the mask in place dislodged or was absent, (2) thereby causing Mohney's head to deflect from a face-forward presentation with the boards to a crown presentation, and (3) that as his body continued forward, the force caused Mohney's spine to buckle.

Bauer argues that Mohney's head initially struck the boards in a crown-first position. Bauer maintains that there was no rotation of the head from a face-forward presentation to a crown presentation.

**C.      Procedural History**

4

Plaintiffs filed this action in 1997. In 1999, Judge Katz granted summary judgment in favor of all defendants on the basis of a "Release of Liability/Acknowledgment of Risk" signed by Mohney prior to joining the Indianapolis Amateur Ice hockey team in the fall of 1994 (a document also signed by his father, Plaintiff-Appellant Timothy Mohney). *See Mohney v. USA Hockey, Inc.*, 77 F.Supp.2d 859 (N.D. Ohio 1999). The "Release of Liability/Acknowledgment of Risk" included the following provision: "I/we understand and appreciate that participation or observation of the sport constitutes a risk to me/us of serious injury, including permanent paralysis or death." The district court's 1999 decision was affirmed in part and reversed in part by this Court, *see Mohney v. USA Hockey, Inc.*, 5 Fed.Appx. 450 (6th Cir. 2001), which remanded the case to the district court so that the products liability claim against Bauer and the mask manufacturer (Jofa) could be heard.

In the fall of 2003, Bauer and Jofa filed motions for summary judgment and motions to exclude the reports of Plaintiffs' experts, Richard Collins, Ph.D. ("Dr. Collins") and Norman Johanson ("Johanson"). A telephonic hearing was held on December 26, 2003, pursuant to which Judge Katz orally ruled that the affidavit of Dr. Daniel A. Funk ("Dr. Funk") would be stricken. From January 7-10, 2004, a *Daubert*[2] hearing was held with respect to the parties' proposed experts, including Dr. Collins and Johanson. Between the time of the *Daubert* hearing and January 23, 2004, Plaintiffs settled their claims against Jofa. On January 23, 2004, Judge Katz issued a Memorandum, Opinion and Order, pursuant to which he granted Bauer's motion to exclude Plaintiffs' experts and Bauer's motion for summary judgment.

## II. ANALYSIS

---

[2] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993).

**A.     Exclusion of Plaintiffs' Experts**

A district court's decision to admit or exclude expert testimony is reviewed for abuse of discretion, and this Court will only reverse if firmly convinced that the district court erred.  *Clay v. Ford Motor Co.*, 215 F.3d 663, 666 (6th Cir. 2000).

*1.     Dr. Collins' Testimony*

In *Daubert*, the U.S. Supreme Court listed four factors as guidelines for a trial judge to consider in assessing whether an expert's proposed testimony involving scientific or other specialized knowledge will conform to Fed. R. Evid. 702:

      (a)     whether the theory or technique can be or has been tested;

      (b)     whether the theory has been subjected to peer review and publication;

      (c)     the known or potential rate of error; and

      (d)     general acceptance within the relevant scientific community.

*Daubert*, 509 U.S. at 594; *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 n.5 (6th Cir. 2001).

In this case, the district court conducted an extensive inquiry into the qualifications and reliability of the opinions of Dr. Collins and Johanson (as discussed below), including "a review of their deposition testimony, expert reports, testimony during a *Daubert* hearing (consisting of approximately 30 hours of testimony), along with a summary of such evidence during oral arguments."   The district court recognized Dr. Collins as a qualified expert in the field of

biomechanical engineering and summarized Dr. Collins' opinion testimony as follows (which Dr. Collins admitted was a correct interpretation):

> In laymen's terms, what your [sic] saying [is] that your analysis reveals that as the mask went into the boards in face-first posture, that the equilibrium of forces was destroyed by the giving way of the J-clip on the right side, thereby permitting the vertical force to take over because the mask gave way and causing the downward rotation to the crown presentation.

The district court excluded Dr. Collins' testimony because "[w]hile Dr. Collins has performed mathematical calculations, the Court has found these calculations and the methods employed to be suspect and unreliable."

Our review of the record leads us to reach the same conclusion as the district court. First, Dr. Collins' analysis was based on his personal review of the helmet and mask. His research included watching the videotape of the incident and performing measurements of the helmet and mask, then incorporating such observations and measurements into mathematical calculations based on Newton's Laws of Physics, a recognized and valid scientific method. Dr. Collins did not, however, attempt to replicate the incident, perform any manner of accident reconstruction or conduct any relevant technical or scientific testing of the helmet/facemask combination (using either the incompatible components present in this case or compatible helmets and masks). Dr. Collins acknowledged that such testing could have been performed to evaluate the veracity of his claims (and Dr. Collins in fact had set up a protocol for such tests), but Plaintiffs had not authorized him to conduct any such tests.

Second, Dr. Collins did not cite any published work to buttress his opinion, nor could he

7

because Dr. Collins' theory has not been subject to peer review and publication. Third, not only does Dr. Collins' opinion that Mohney's spinal injury could occur as the result of a face-first impact lack general acceptance within the relevant scientific community, it is not accepted in any scientific community. In fact, Dr. Collins' preliminary review dated January 24, 2002, quoted another researcher/expert as saying:

> Biomechanical studies have not supported the notion that the helmet is an important factor in causing spinal injury (Bishop *et al*. 1983). . . . La Prade and co-workers (1998) found no evidence that face masks are related to an increase in overall head and neck injuries.

Fourth, Dr. Collins performed his calculations based on a series of assumptions (including the theory of Johanson regarding the abrupt release of the J-clip rejected by the district court (as discussed below)). Dr. Collins admitted that he did not utilize the actual data as input in the mathematical equations to support his theory but rather used an "illustration of parameters," *i.e.*, estimates. Dr. Collins then concluded that, within a reasonable degree of biomechanical certainty, such incompatibility of the mask and helmet combination led to a re-direction of the impact forces to cause the spinal injuries and permanent disability. We find that the estimates and assumptions used by Dr. Collins undermine the likelihood that Dr. Collins used data sufficiently tied to the facts of the case here, which the Supreme Court has indicated is critical:

> Nothing either in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proferred.

*General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The correspondence between Dr. Collins

8

and his supervisors also suggests that his supervisors were not convinced of the reliability of Dr. Collins' calculations and conclusions.

For the reasons stated, we hold that the district court did not abuse its discretion in excluding Dr. Collins' testimony.

2.     *Testimony of Johanson*

The district court recognized Johanson as a qualified expert in the field of mechanical engineering.  In summary, Johanson concluded that: (a) the incompatibility of the helmet and mask resulted in an asymmetric attachment of the mask, (b) such asymmetry resulted in the mask's full engagement of the left-hand side J-clip but only minimal engagement with the right-hand side J-clip, (c) based on that minimal engagement on the right-hand side, two screw-nut combinations affixing the right-hand side J-clip were loosened over time, such that (d) when Mohney's face struck the boards, the pre-existing loose fitting screw-nut combinations instantly and simultaneously vibrated apart at or immediately after the initial time of impact, (e) resulting in the J-clip dislodging, and (f) allowing the mask to release to the downward torque.

The district court found Johanson's testimony on the asymmetrical fit of the mask and helmet to be reliable but excluded Johanson's testimony regarding the screw-nut combination and J-clip because it was not the product of a reliable methodology.   Plaintiffs claim that the exclusion of Johanson's J-clip testimony was due to the district court's adoption of Bauer's version of the facts, namely Johanson's conclusion that the J-clip was not present at the time of the incident.  A simple review of the portion of the district court's opinion excluding Johanson's testimony regarding the

9

J-clip reveals that the district court did not discuss the facts of the case whatsoever. Rather, the district court concluded that Johanson did not perform any tests to form his opinions in this case, but had simply based his opinion on his visual inspection and measurements of the helmet and mask. The district court rejected Plaintiffs' contention that Johanson conducted a "test" by shaking the J-clip back and forth with his hand while resting an exemplar helmet on a table.

We find that the district court did not abuse its discretion in concluding that Johanson had not conducted adequate testing to support his opinion. First, there is no evidence that the "test" conditions accurately replicated or even approximated those at the time of the incident. Second, Johanson cited no research or publications quantifying the impact forces (vibrations) necessary to cause the screw-nut combinations to become loose. Third, Johanson's conclusions are further undermined because Johanson: (i) assumed (but did not know) the remaining screw-nut combinations on the left-hand side J-clip were the same as those on the right side, (ii) did not attempt to determine the thread class of the screws or test whether the thread class of the left-hand side screw-nut combinations was sufficient, but rather just made the assumption that they were not, and (iii) failed to support his opinion with any objective testing or analysis (i.e., using any control standards). We conclude that such "testing" and Johanson's opinion on the basis of such "testing" cannot be considered reliable under the four factors set forth in *Daubert, supra*.

For the reasons stated, we hold that the district court did not abuse its discretion in excluding Johanson's testimony regarding the J-clip.

*3.     Dr. Ramnath's Affidavit*

Dr. Ramnath was the treating physician at the hospital to which Mohney presented immediately following his injury on May 21, 1995. Dr. Ramnath completed a history and physical of Mohney, which included the following statement: "This seventeen year old man was playing hockey at approximately 11:00 this morning and was thrown face forward into the boards, striking his face against the boards." Plaintiffs submitted an affidavit signed by Dr. Ramnath detailing his treatment of Mohney and Dr. Ramnath's conclusions regarding the manner in which Mohney's injury occurred. Paragraphs 9-11 of Dr. Ramnath's affidavit state:

9. I have had the opportunity to review the MiniDV tape of the accident. The accident is consistent with the history recorded in my records. Levi Mohney hit the boards face first. Subsequent to the initial impact, his head rotates down so that the crown of his head is in contact with the boards.

10. This history is consistent with a facial impact and rotation into a crown presentation with a vertical load and hyperflexion type of injury.

11. The injuries Levi Mohney sustained are consistent with the history and physical findings of the injury recorded in the medical records of Flower Hospital, and with the tape of the accident.

The district court excluded Paragraphs 9-11 of Dr. Ramnath's affidavit because Dr. Ramnath based his conclusions in such paragraphs on his review of the videotape of the incident, not his personal observations of Mohney in treating him.

Plaintiffs-Appellants did not list Dr. Ramnath as an expert (and do not seek to have him testify as one) but rather argue that a treating physician may render opinions with respect to causation without being subject to disclosure requirements of Fed. R. Civ. P. 26(a)(2)(B). *See Martin v. CSX Trans., Inc.*, 215 F.R.D. 554 (S.D. Ind. 2003). The *Martin* court, however, ruled that

11

disclosure requirements were not necessary in that case because the treating physician formed the causation opinion during the care and treatment of the plaintiff, not in anticipation of litigation. On the other hand, the *Martin* court also noted that where the treating physician's opinion is rendered in anticipation of litigation, courts have held that "causation is beyond the scope of the testimony a treating physician may provide without tendering an expert disclosure report." *Id.* at 556-57 (citations omitted) (recognizing a split of authority on the issue in the Seventh Circuit).

More significantly, this Court has squarely addressed this issue. *See Harville v. Vanderbilt University, Inc.*, 95 Fed.Appx. 719 (6th Cir. 2003). In *Harville*, this Court upheld a district court's decision to exclude the expert testimony portions of the deposition testimony of treating physicians for failure to comply with Rule 26 disclosure requirements. *Id.* at 724-25; *cf. Ridder v. City of Springfield*, 108 F.3d 1377, 1997 WL 117024, at *4 (6th Cir. 1997) (upholding order permitting plaintiff's treating physician to testify without Rule 26(a)(2)(B) expert report disclosures "so long as they do not purport to testify beyond the scope of their own diagnosis and treatment").

Despite Dr. Ramnath not being listed as an expert witness, he clearly was opining as to the manner in which Mohney's head rotated from a facial impact to a crown presentation, based in part on his viewing of the video. Dr. Ramnath's affidavit was not prepared until December 2002, long after the incident occurred. There is no evidence that Dr. Ramnath reached the same conclusions regarding causation at the time he treated Mohney. As such, it was reasonable for the district court to find that Dr. Ramnath was rendering an expert opinion that was subject to disclosure requirements and to exclude his affidavit for failing to satisfy those requirements. Moreover, by striking only Paragraphs 9-11 of Dr. Ramnath's affidavit, the district court left intact those matters over which

12

Dr. Ramnath had personal knowledge. Accordingly, we hold that the district court did not abuse its discretion in excluding Paragraphs 9-11 of Dr. Ramnath's Affidavit.

*4.      Affidavit of Daniel Funk, M.D.*

Dr. Funk prepared an affidavit based on his examination of the helmet as well as the medical records and x-rays that were obtained immediately after Mohney's injury. He opined that (a) physical evidence on the helmet and mask indicated that Mohney struck the boards in a face first position, (b) upon impact the right clip fastener (J-clip) failed, and (c) such failure contributed to a consequential flexion and rotation of Mohney's head. The district court's January 23, 2004, Memorandum, Opinion and Order includes the following discussion of Dr. Funk's affidavit (emphasis added):

> [Bauer] also seeks to exclude the affidavits of Dr. Funk and Dr. Ramnath, arguing that to admit them is tantamount to offering expert testimony in contravention of disclosure requirements in Rule 26. Dr. Funk's affidavit presents findings regarding the helmet-mask combination in this case and their role in causing [Mohney]'s head to torque from a face first to a crown position. This affidavit represents an attempt to buttress the opinions offered by Mr. Johanson and Dr. Collins, Plaintiffs' retained liability experts, with testimony from an *unlisted/unidentified expert witness*. Thus, Dr. Funk's affidavit is inadmissible and stricken in its entirety.

Plaintiffs argue that the district court erred in excluding the affidavit because Plaintiffs' Designation of Experts filed on September 10, 2001, listed him as an expert witness (and included a copy of his affidavit and C.V.). Plaintiffs assert that a clerical problem led to the document not being put on the docket until after the district court granted summary judgment in 2004.

Our review of the record reveals the following. First, on February 8, 2002, the district court directed Plaintiffs to provide all outstanding expert disclosure. On February 22, 2002, Plaintiffs filed Supplemental Expert Disclosures in which Dr. Collins was listed (and Dr. Funk was not listed) as a liability expert for Plaintiffs. Second, Bauer filed a motion to strike affidavits (including that of Dr. Funk) on procedural and substantive grounds on December 19, 2002. Among the reasons to exclude Dr. Funk's affidavit set forth in Bauer's motion to strike affidavits were the following: (i) since the appeal of the 1999 grant of summary judgment by the district court, Plaintiffs had not utilized Dr. Funk, (ii) Dr. Funk had been replaced as a liability expert by Dr. Collins, (iii) at pre-trial conferences with the district judge, the only liability experts of Plaintiffs discussed were Dr. Collins and Johanson, (iv) in a March 18, 2002, letter, Plaintiffs' counsel identified only Dr. Collins and Johanson as expert witnesses, and (v) by Dr. Funk's own admission, the opinion set forth in his affidavit was an untested theory and nothing more (he had conducted no research or testing). Pursuant to a December 26, 2002, telephonic hearing, the district court struck Dr. Funk's affidavit in its entirety.[3] Third, at the *Daubert* hearing, the district court said "I believe in an oral order to the parties there was an indication that Dr. Funk's affidavit had been stricken from the record[.]"

In considering this issue, the district court's rationale in the Memorandum, Opinion and Order dated January 23, 2004, appears to be technically inaccurate, as Dr. Funk clearly was listed on the September 10, 2001, Designation of Experts. The fact of the matter, however, is that the district court struck Dr. Funk's affidavit at the December 26, 2003, hearing, long before issuing its written Memorandum, Opinion and Order. Although the parties have not produced a transcript of

---

[3] Neither of the parties set forth the basis of the district court's ruling from that telephonic hearing, nor has a transcript of that hearing been put in the record.

the December 26, 2003, hearing, any one of the grounds set forth by Bauer in its motion to strike would provide sufficient basis upon which to strike Dr. Funk's affidavit.  In addition, the district court explicitly stated that Dr. Funk's affidavit had been excluded during the December 26, 2004, hearing at the initial day of the *Daubert* hearing (without objection by Plaintiffs' counsel), prior to the issuance of the Memorandum, Opinion and Order.

Accordingly, we hold that the district court did not abuse its discretion in excluding Dr. Funk's affidavit.

**B.      Summary Judgment Issues**

*1.      Standard of Review*

This Court reviews a district court's grant of summary judgment on a *de novo* basis. *Dubuc v. Green Oak Township*, 312 F.3d 736, 743 (6th Cir. 2002).  Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted).  In application of this summary judgment standard, this Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  *See also Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001).  "If the evidence is merely colorable

15

or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

*2.      Initial Position of Mohney's Head*

Plaintiffs argue that the district court erred in granting summary judgment because there is a disputed issue of whether the initial impact of Mohney's head into the boards was face first or crown first. Plaintiffs do not cite the page upon which the district court reached this conclusion. Our review of the district court's opinion and the record reveals that there is clearly a dispute regarding the issue of whether Mohney's initial impact with the boards was face first or crown first, and the district court, at least implicitly, recognized as much. *See* J.A. 48 ("[T]he relevant inquiry is not whether Jamey and Terry Cearley were able to see the torque of Levi's head, but rather whether they observed a face first impact. No valid argument has been proferred that either was unable to see the initial point of impact. . . . Thus, Jamey and Terry Cearley's affidavits [indicating

16

that Mohney struck the boards face first] are admissible").

More significant to this appeal, however, is whether this disputed issue of fact is material. As addressed above, the district court appropriately excluded all testimony which could support the theory that Mohney's injury was caused by the rotation of Mohney's head from a face first presentation to a crown presentation. Moreover, there is no testimony that the helmet itself caused the injury. Accordingly, even if Mohney went into the boards face first, there is no basis upon which Plaintiffs can demonstrate that Bauer was at fault for, or is a proximate cause of, the resulting injury.

### 3. Bauer is not a Manufacturer

Plaintiffs have asserted that Bauer is the manufacturer of the "head protection system" (*i.e.,* the combination of the Bauer helmet, Jofa mask and assorted hardware, including nuts, screws and the J-clips) worn by Mohney. The district court held that, for purposes of Plaintiffs' product liability claim, Bauer was merely a manufacturer of a component part (the helmet) under Ohio Law, not the manufacturer of the head protection system.

A component manufacturer can only be deemed liable for product liability purposes if it assembles, designs or otherwise integrates such component into a design which creates a final product. *See* O.R.C. §2307.71(A)(9)(2005); *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d 266, 271 (1993); *Miles v. Kohli & Kaliher Assocs., Ltd.*, 917 F.2d 235, 245 (6th Cir. 1990)(supplier of bridge components also provided information on how to assemble all components and was therefore a manufacturer for the purposes of products liability). A manufacturer who markets a product in an unassembled state and is not involved in the design or assembly of the integrated product or system

17

cannot be liable for a defect introduced by a third party. *See Schaffer v. A.O. Smith Harvestore Prods. Inc.*, 74 F.3d 722, 729 (6th Cir. 1996) ("[w]ithout any evidence of defect in the component parts themselves, summary judgment is appropriate to the defective products claims" based on a combination theory); *Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784 (6th Cir. 1984).

We are not persuaded by Plaintiffs' reliance on two Sixth Circuit cases to support their contention that Bauer is a manufacturer. Plaintiffs first assert that the instant case is analogous to *Miles* because Bauer manufactured the helmet and the J-clip and knew players were mixing and matching helmets and masks. Plaintiffs' argument is misguided, however, as the key to the *Miles* court's conclusion was that the component part supplier also drafted the design of the finished bridge and therefore had superior knowledge of certain dangers. Here, at most Bauer knew that the helmet would be a component of the head protection system. There is no evidence that Bauer assembled the helmet and mask into a single unit. Moreover, it is undisputed that Bauer did not provide instructions or specifications on assembly of the specific helmet/mask combination worn by Mohney. The facemask worn by Mohney, however, did come with mounting instructions and provided mounting hardware such as screws and nuts. Therefore, no factual inference can be made that Bauer instructed the assembly of the combined product.

Plaintiffs also rely on *Webb v. S.R.S. Liquidation Co.*, No. 02-4009, 2004 U.S. App. LEXIS 4522 at *1 (6th Cir. Mar. 8, 2004), wherein this Court held that it would be unfair to hold a component part manufacturer responsible for failing to anticipate the manner in which its products would be integrated into larger systems by third parties. Plaintiffs argue that in this case Bauer should be liable because Bauer knew that the helmet would be integrated into a head protection

18

system and the manner in which it would be assembled. Again, there is no evidence that, even if Bauer could be said to have knowledge of (or responsibility for) the end product, Bauer knew or had reason to know that the head protection system could cause a spinal injury as the result of downward torque upon a face first impact.

Plaintiffs next rely on a Third Circuit case in which a manufacturer of a replacement swimming pool liner was held strictly liable for its failure to attach warning labels stressing the dangers of diving into a shallow pool. *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107 (3ᵈ Cir. 1992). The Third Circuit rejected the manufacturer's argument that it was only a supplier of a component part and should not be expected to foresee the dangers of diving into a shallow pool because the pool liner had but one use, which was to line the pool and the dangers of failing to affix warning labels was easily foreseeable. Plaintiffs suggest the same analysis applies in this case because Bauer should reasonably have foreseen the danger of warning about non-compatible helmets and masks. Plaintiffs also point out that it would have been feasible to attach such warnings to the helmet and that Bauer easily could have warned players to use only compatible helmet-mask combinations and to consult literature to ensure the products were compatible.

Unlike the *Fleck* case, however, and for the reasons stated above (namely, that there is no evidence that a spinal injury has ever been attributed to an incompatible helmet/mask combination or downward torque of the head caused by face first impact into the boards), we conclude that there is no reason Bauer should have foreseen the danger of the injury to Mohney allegedly caused by the head protection system here. In addition, unlike the pool liner in *Fleck*, Bauer's helmet does warn that spinal injuries could result from playing hockey and that the helmet does not afford protection

19

for the same. As such, the law does not support Plaintiffs' position that Bauer is a manufacturer of the head protection system.

For the reasons set forth above, we conclude that the district court did not err in holding that Bauer was not a manufacturer of the head protection system.

*4.     Failure to Warn Claim*

Plaintiffs believe the district court erred in dismissing Plaintiffs' failure to warn claim because Mohney's failure to read the warning label prominently displayed on the back of the helmet vitiated any proximate cause attributable to Bauer. In order to survive summary judgment under a failure to warn theory, a plaintiff must prove: (1) the product posed a risk of harm for which plaintiff seeks recovery; (2) the manufacturer knew, or reasonably should have known, of the existence of such risk; (3) the manufacturer failed to provide an adequate warning or instruction concerning that risk; and (4) the lack of an adequate warning was the proximate cause of Plaintiffs' injuries. O.R.C. 2307.76(A)(1); *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 200 (1981); *Chic Promotion, Inc. v. Middletown Security Syst., Inc.*, 116 Ohio App.3d 363, 369 (1996). Under Ohio law, the question of whether a manufacturer has a duty to warn is a question of law. *Schaffer*, 74 F.3d at 729; *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989).

Like the other issues in this case, Plaintiffs' argument suffers from the fact that, absent the stricken testimony of Plaintiffs' experts, Plaintiffs have no evidence to show that the injury to Mohney was proximately caused by the head protection system. For that reason, Plaintiffs cannot satisfy any of the four required elements described above. First, there is no evidence that an injury

like Mohney's (paralysis) due to a defective head protection system had occurred prior to Mohney's accident (nor were there any tests or articles that suggest that such an injury was likely as a result of the same). In fact, in light of the lack of scientific testing conducted by Plaintiffs' experts and the exclusion of their opinions/testimony due to the unreliability of their theories, even today there is no evidence (or reliable expert opinion) that such an event occurred in this case. Second, Bauer did not know, nor could Bauer have had reason to know, such a system could cause a spinal injury for a player who goes into the board face first. The earliest the theory set forth by Plaintiffs became known or should have become known was upon the occurrence of Mohney's injury.

Third, the warning on the helmet made by Bauer cautioned Mohney of the danger of the very injury suffered by Mohney (spinal injury), and stated that the helmet "affords no protection for neck or spinal injury" and "severe head, brain or spinal injuries, including paralysis or death, may occur despite using this helmet." Therefore, the warning on the helmet alone provided information regarding the very risk Plaintiffs assert is associated with the head protection system.

Fourth, as recognized by the Ohio Supreme Court in *Seley*, a plaintiff is given the benefit of a rebuttable presumption that he would have heeded an adequate warning; however, that presumption can be overcome with evidence suggesting that the warning would have been disregarded by plaintiff. *Seley*, 67 Ohio St.2d at 200-01. *See also Hirsch v. Volvo*, 226 F.3d 445, 451 (6th Cir. 1995) ("Ohio courts have found that when evidence shows that plaintiff failed to read instructions proximate cause is rebutted")*; Vermett v. Fred Christen & Sons Co.*, 138 Ohio App.3d 586, 612 (2000) (evidence demonstrating that plaintiff is a person who is indifferent to safety warnings, such as the past disregard of warnings, is sufficient to rebut the presumption). Here,

21

Mohney admitted that (a) he put the helmet on and took it off hundreds of times, (b) the warning on the helmet was plain and unambiguous, (c) he purposefully did not read the warning on the helmet, and (d) he did not read similar warnings set forth on releases he signed over the years or on product hang tags such as those on the Jofa mask. As such, it was reasonable for the district court to conclude that Mohney's admitted indifference to safety warnings rebutted any proximate cause attributable to Bauer.

For the reasons set forth above, we hold that the district court did not err in dismissing Plaintiffs' failure to warn claim.

*5.     Consumer Expectation Standard*

For products designed prior to January 27, 1997, the existence of a product defect may be inferred by demonstrating that the product "is more dangerous than an ordinary consumer would expect when using it in an intended and reasonably foreseeable manner" (the "consumer-expectation standard"). *See* O.R.C. 2307.75(A) (2)(revoked); *Atkins v. General Motors Corp.*, 132 Ohio App.3d 556 (1999). Plaintiffs contend the consumer-expectation standard is applicable in this case; the district court held otherwise.

Under the consumer-expectation test, a product may be proven to be in a defective condition if: (1) it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, (2) the claimed defect was present when the product left the manufacturer, and (3) the claimed defect proximately caused the claimed injuries. *Leichtamer v. American Motors Corp.*, 67 Ohio St.2d 456, 494 (1981). In this case, we have already concluded

that Bauer is not the manufacturer of the head protection system and that proximate cause for the injuries to Mohney has been rebutted. Accordingly, we hold that the district court did not err in failing to apply the consumer expectation standard in this case.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's grant of summary judgment and dismissal of Plaintiffs' action.

23