**Craig BERNER, Plaintiff,**

**v.**

**CARNIVAL CORPORATION, Defendant.**

**Case No. 08–22569–CIV.**

United States District Court, S.D. Florida, Miami Division.

July 2, 2009.

John Heyward Hickey, Hickey Law Firm PA, Miami, FL, Paul M. Hoffman, Fort Lauderdale, FL, for Plaintiff.

David James Horr, Eduardo Jesus Hernandez, Horr Novak & Skipp, Miami, FL, for Defendant.

## ORDER

CECILIA M. ALTONAGA, District Judge.

THIS CAUSE came before the Court on Defendant, Carnival Corporation's ("Carnival['s]") Motion to Exclude Expert Testimony of Jamie Williams Ph.D., (the "Motion") [D.E. 124], filed May 8, 2009. The Court has carefully reviewed the parties' written submissions and applicable law.

## I. BACKGROUND

Craig Berner was a passenger on the cruise ship *Carnival Glory* when he was attacked and beaten by two fellow passengers. According to Berner, a passenger approached him in a hallway and punched the right side of his face so hard that he fell to the floor, immediately losing consciousness. Witnesses say the passenger's girlfriend "stomped" on Berner's face with her stiletto heel six or seven times, and that Berner lay unconscious on the ground for a period of time thereafter. Berner suffered considerable injuries to his eye, face, and skull, and Berner alleges he has suffered a traumatic brain injury. In September 2008 Berner sued Carnival because Carnival allegedly failed to exercise reasonable care for the safety of its passengers, including Berner.

Berner seeks to call Jamie R. Williams, Ph.D. ("Dr. Williams") as an expert witness to testify "about the forces required to achieve the injuries that Mr. Berner suffered." (Pl.'s Second Amended Expert Witness Disclosure [D.E. 47] at 17). In particular, Dr. Williams, a biomechanical engineer, may be called to give three professional opinions within a reasonable degree of engineering certainty: (1) "During

the assault, Berner was struck with sufficient force to cause his right orbital blow out fracture[; (2) ] The force to cause Berner's right orbital blow out fracture was sufficient to destabilize Berner and/or stun him, causing him to fall and strike his head on the floor[; and (3) ] The energy on Berner's head upon striking the floor was sufficient to have caused his mild to moderate traumatic brain injury." (Biomechanical Expert's Report ("Report") [D.E. 56] at 6 (vertical list set as run-in list)).

It is Dr. Williams's third opinion that Carnival seeks to exclude. Carnival states that Dr. Williams, as a biomechanical engineer, is not qualified to testify about the cause of Berner's alleged mild to moderate traumatic brain injury. (*See* Mot. at 5). Carnival further contends that Dr. Williams's opinion is "unreliable and speculative as no identifiable methodology was utilized which sufficiently demonstrates how Dr. Williams concluded that 'the energy on Berner's head upon striking the floor was sufficient to have caused his mild to moderate traumatic brain injury.' " (*Id.* at 6).

## II. ANALYSIS

### 1. Governing Law

Federal Rule of Evidence 702, which governs expert testimony, states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This "gatekeeping" function must be performed with regard both to the admissibility of expert scientific evidence and to that of expert technical evidence. *See United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004) (citing *Daubert,* 509 U.S. at 589 n. 7 & 597, 113 S.Ct. 2786, and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). "This function inherently requires the trial court to conduct an exacting analysis of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.* (alterations and internal quotation marks omitted).

In determining the admissibility of expert testimony, courts must conduct a three-part inquiry about whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the applications of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (quoting *City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir. 1998)). Courts may consider the following factors to determine whether a specific methodology is reliable: whether the methodology can and has been tested; whether the methodology has been subjected to peer review and publication; the known or potential rate of error and the

existence and maintenance of standards controlling operation of the methodology; and whether the methodology has gained general acceptance in the scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786; *accord Kumho*, 526 U.S. at 141, 119 S.Ct. 1167. This inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786, and the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. 2786. The proponent of the expert testimony bears the burden of its admissibility. *See Frazier*, 387 F.3d at 1260.

### 2. Dr. Williams's Qualifications to Testify

■ Carnival states Dr. Williams is not qualified to testify about the cause of Berner's alleged brain injury. (*See* Mot. at 5). This is so because, as a biomechanical engineer, Dr. Williams "is not a neuropsychology expert and as such does not have the expertise necessary to assert what is or is not sufficient to cause mild to moderate traumatic brain injury." (*Id.*). Carnival asserts that biomechanical engineers "are not qualified to render medical opinions regarding the precise cause of a specific injury." (Def.'s Reply [D.E. 145] at 1 (quoting *Laski v. Bellwood*, No. 99–1063, 2000 WL 712502, at *3 (6th Cir. May 25, 2000) (quoting *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 305 (6th Cir.1997), *abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 515 & n. 4 (6th Cir.1998))) (internal quotation marks omitted)).

For his part, Berner states that "calculating the force involved in an accident and the sufficiency of such force to cause the injury in question falls squarely within the testifying realm of a biomechanical expert, including and especially Dr. Williams." (Pl.'s Resp. [D.E. 130] at 7). According to Berner, Dr. Williams is not offering a diag-

nosis; rather, she accepts the injuries as diagnosed by other doctors and her "opinions focus on the forces involved in the blows sustained by [Berner] and the human tolerance levels or, in other words, the levels at which certain injuries may occur." (*Id.* at 8).

The U.S. Court of Appeals for the Sixth Circuit addressed whether a biomechanical engineer was qualified to testify about the causation of a particular injury in *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299 (6th Cir.1997). In *Smelser*, an employee sued his employer "for injuries sustained when the company pick-up truck he was driving to a job site was hit in the rear by another motorist." *Id.* at 301. The employee "alleged that the company truck had a defective safety belt which caused the injuries." *Id.* The trial court allowed the employee's expert, a biomechanical engineer, to testify that the defective seat belt and not the rear-end collision caused the employee's injuries. *Id.* The Sixth Circuit reversed because the biomechanical engineer's "opinion as to the cause of [the employee]'s specific injuries went beyond his expertise in biomechanics." *Id.* The biomechanical engineer "was qualified to render an opinion that made use of his discipline's general principles, described the forces generated in the . . . rear-end collision, and spoke in general about the types of injuries those forces would generate. . . . [But] his expertise in biomechanics did not qualify him to testify about the cause of [the employee]'s specific injuries." *Id.* at 305.

The Sixth Circuit further defined the contours of a biomechanical engineer's qualifications to testify about causes of injury in *Laski v. Bellwood*, No. 99–1063, 2000 WL 712502 (6th Cir. May 25, 2000). Like *Smelser*, *Laski* involved a rear-end collision in which the driver sued for damages because of the other's negligence.

*Id.* at *1. The defendant called a biomechanical engineer who testified he did not believe the rear-end collision caused the driver's back injuries. *Id.* at *3. The jury found for the defendant, and the driver's motion for a new trial was denied. *Id.* at *1. The Sixth Circuit affirmed the district court's decision to admit the biomechanical engineer's testimony over the driver's argument that his "opinion about the cause of plaintiff's specific medical condition was beyond the scope of the [biomechanical engineer]'s expertise in biomechanics." *Id.* at *3. In doing so, the court stated:

> Plaintiff's contention that *any* opinion as to causation should be disallowed due to [the biomechanical engineer]'s expertise in biomechanics as opposed to medicine should be disregarded. While [the biomechanical engineer] was qualified to give general opinions about causation, he was not qualified to give *medical* opinions. In fact, the *Smelser* court specifically stated that 'biomechanics are qualified to determine what injury causation forces are in general and can tell how a hypothetical person's body will respond to those forces, but are not qualified to render medical opinions regarding the precise cause of a specific injury.'

In this case, [the biomechanical engineer] testified rather extensively as to the *forces necessary to produce certain types of back injuries* .... The vast majority of this testimony falls squarely within the allowable biomechanical testimony outlined in *Smelser*.... [The biomechanical engineer] ended by saying that he did not believe the condition shown in [the driver]'s second MRI was a result of the 1993 accident. This last portion of [the] testimony arguably violates the rule in *Smelser*.

*Id.* at *3–4 (citations omitted and third emphasis added).

Other courts that have considered whether a biomechanical engineer is qualified to testify about the cause of an injury have ruled consistently with *Smelser. See, e.g., Wagoner v. Schlumberger Tech. Corp.,* No. 07–CV–244–J, 2008 WL 5120750, at *1 (D.Wyo. June 19, 2008) ("[Biomechanics experts] may, for example, testify as to the forces involved in the ... accident and how those forces may affect an individual or object; they may not express any opinions regarding whether plaintiff ... has suffered a brain injury ... or as to the ... cause of the alleged brain injury."); *Morgan v. Girgis,* No. 07 Civ.1960(WCC), 2008 WL 2115250, at *5–6 (S.D.N.Y. May 16, 2008) (similar); *Bowers v. Norfolk S. Corp.,* 537 F.Supp.2d 1343, 1377 (M.D.Ga. 2007) ("[A biomechanical engineer] may testify as to the effect of locomotive vibration on the human body and the types of injuries that may result from exposure to various levels of vibration.... [H]e may not offer an opinion as to whether the vibration ... caused Plaintiff's injuries."); *Shires v. King,* No. 2:05–CV–84, 2006 WL 5171770, at *3 (E.D.Tenn. Aug. 10, 2006) ("[The biomechanical engineer] clearly should be allowed to testify regarding the forces applied to plaintiff's head ..., and how a *hypothetical* person's body would re-spond [sic] to that force. He cannot offer opinions, however, 'regarding the precise cause' of plaintiff's injury.").

Under *Smelser* and the cases following it, and owing to her qualifications and experience as a biomechanical engineer,[1] Dr.

---

1. Dr. Williams holds a Ph.D. in Bioengineering from the University of Illinois at Chicago, Illinois. (*See* Pl.'s Resp. Ex. B [D.E. 130–3] ). She is a Visiting Professor in the Department of Orthopedic Surgery at the Rush University Medical Center, as well as an adjunct professor in the Department of Bioengineering at the University of Illinois at Chicago. Since 2000 she has written and presented numerous papers in the disciplines of bioengineering

Williams may testify that the "energy on Berner's head upon striking the floor was sufficient to have caused his mild to moderate traumatic brain injury." Dr. Williams will not testify that Berner *has* a mild to moderate *traumatic brain injury*— or a brain injury at all. She will not testify that Berner's brain injury (if any) *was caused* by his head striking the floor. As Carnival quite correctly points out, she may not give an opinion about whether Berner has suffered a brain injury or about the cause thereof.

But Dr. Williams is not called to give an opinion that Berner has suffered a brain injury or that his head striking the floor caused an injury. Rather, she may give an opinion about the energy involved and whether the energy is *sufficient* to have caused an injury of the type Berner alleges to have suffered. Biomechanical engineers are qualified to testify about how forces may affect or injure an individual. *See Laski*, 2000 WL 712502, at *3; *Bowers*, 537 F.Supp.2d at 1377. And Dr. Williams, by her education, knowledge, and training as a biomechanical engineer, is qualified to testify about the forces involved here and the kinds of injuries that may have resulted therefrom.

### 3. Dr. Williams's Methodology

■ The methodology used by Dr. Williams in concluding that the "energy on Berner's head upon striking the floor was sufficient to have caused his mild to moderate traumatic brain injury" is found in her report and in her affidavit. In her report, Dr. Williams states,

> Using Newton's Laws of Physics, the impact velocity of Berner's head striking the floor can be quantified. Impact velocity is independent of the mass of the

object, but is dependent on the vertical distance the object travels. Berner is 5′9″ tall. Utilizing the principles of Conservation of Energy and Work, falling from his upright posture, Berner's head struck the floor with a velocity of about 12 mph.

> Concussions resulting from head impacts occur with impact energies between 36–44 lb-ft. [*See* Andrew S. McIntosh, et al., *The Dynamics of Concussive Head Impacts in Rugby and Australian Rules Football*, MED. & SCI. SPORTS & EXERCISE, Feb. 2000, at 1980, 1983.] Applying the Conservation of Energy Principles, the average head mass is 10 lbs and an impact velocity of 12 mph, Berner's head striking the floor resulted in an impact energy of about 56 lb-ft, which is sufficient to cause mild to moderate traumatic brain injury.

(Report at 4–5 (footnote citation placed in text)).

Dr. Williams explains that her conclusions are supported by the laws of physics; her education, experience, and research; and "by universally accepted principles in the bioengineering field, as well as all fields of engineering as evidenced in the article which [she] sited in [her] report." (Pl.'s Resp. Ex B. ¶ 11). "Once the energy was calculated, [Dr. Williams] compared [it] to the energy measured and reported to cause concussion (mild traumatic brain injury) in the article cited." (*Id.* ¶ 16). Using a study about the dynamics of head impacts in Australian rules football that resulted in concussions, Dr. Williams states "[c]oncussions resulting from head impacts occur with impact energies between 36–44 lb-ft." (Report at 5). According to Dr. Williams, this methodology

and biomechanics. She is, in sum, qualified to testify in the area of bioengineering, a point

the parties do not dispute.

"is sound and well recognized." (Pl.'s Resp. Ex B. ¶ 17).

Carnival asserts Dr. Williams did not use an identifiable methodology that "sufficiently demonstrates how Dr. Williams concluded that 'the energy on Berner's head upon striking the floor was sufficient to have caused his mild to moderate traumatic brain injury.'" (Mot. at 6). Carnival accepts the principles Dr. Williams used to determine the impact energy of Berner's head striking the floor. (*See id.* at 6–7). But Carnival argues "she impermissibly jumps from her conclusion concerning the impact energy to concluding that said impact energy is sufficient to cause traumatic brain injury without demonstrating any methodology or providing any empirical data used to reach this conclusion." (*Id.* at 7). "Dr. Williams opines that Plaintiff's head allegedly struck the floor with an impact energy of about 56 lb-ft which is above the range of 36–44 lb-ft in which concussions resulted from head impacts purportedly occur." (*Id.* at 7–8). According to Carnival, "no empirical data or other methodology demonstrates how Dr. Williams uses the above-referenced information to conclude that said impact energy is sufficient to cause mild to moderate traumatic brain injury." (*Id.* at 8).

Carnival further contends the study "provides an unreliable link to Dr. Williams' conclusion regarding traumatic brain injury." (Def.'s Reply [D.E. 145] at 7). This is so, Carnival states, because the study concerns concussions and not brain injuries; only nine of the 100 cases in the study dealt with players striking their heads on the ground as Berner did; and whereas the majority of the impacts in the study occurred with the temporal region of a player's head, the region where Berner's head struck the floor is unknown. (*Id.* at 7–8). In sum, Carnival objects to the way Dr. Williams uses her calculations and the study to support her conclusion and Carnival distinguishes the way concussions occurred in the study from the way Berner's alleged brain injury occurred.

How Dr. Williams uses her calculations and the study to make her conclusion appears relatively straightforward. Dr. Williams first determined the impact energy—56 lb-ft. The parties agree that the methods Dr. Williams used—Newton's Laws of Physics and the principles of Conservation of Energy—in determining the velocity at which Berner's head struck the floor and the impact energy resulting therefrom are sufficiently reliable. (*See* Def.'s Reply at 6–7; *see also Mohney v. USA Hockey, Inc.*, 138 Fed.Appx. 804, 808 (6th Cir.2005) (describing Newton's Laws of Physics as "a recognized and valid scientific method"). To be sure, Carnival concedes these conclusions "clearly fall within her area of expertise." (Def.'s Reply at 7).

Dr. Williams then compared the impact energy—56 lb-ft—with the proposition from the study that concussions "resulting from head impacts occur with impact energies between 36–44 lb-ft." According to Dr. Williams, because the impact energy on Berner's head on striking the ground is greater than that (per the study) which causes concussions, it follows that the "energy on Berner's head upon striking the floor was sufficient to have caused his mild to moderate traumatic brain injury." (Report at 5; *see also* Pl.'s Resp. Ex. B. ¶ 16). Although Dr. Williams may not have explicitly stated in her report how she uses her calculations and the study to support her conclusion, she compares her calculations—again, which the parties regard as reliable—against a range set forth in the study. This methodology is relatively straightforward and Berner has met his burden of establishing its reliability.

Carnival also distinguishes the circumstances in which the concussions in the study occurred from the way Berner's alleged brain injury occurred. First, Carnival contends that a concussion is not synonymous with a "mild to moderate traumatic brain injury." (Mot. at 7). Therefore, presumably, any comparison is inapposite and would serve only to confuse the jury. In support of this point, Carnival references the American Medical Association Encyclopedia of Medicine, which defines a concussion as a "brief unconsciousness." (*Id.*). But Carnival does not contend that the Encyclopedia states that a concussion is *not* a brain injury. And Berner provides numerous references that a concussion is synonymous with a brain injury. *E.g.*, CENTER FOR DISEASE CONTROL & PREVENTION, FACTS ABOUT CONCUSSION AND BRAIN INJURY 6, http://www.cdc.gov/ncipc/tbi/tbibook.pdf ("The type of brain injury called a concussion has many symptoms."); *id.* (back cover) ("A blow or jolt to the head can cause a type of mild brain injury called a concussion."); MayoClinic.com, http://www.mayoclinic.com/health/concussion/DS00320 (last visited July 2, 2009) ("[E]very concussion, no matter how mild, injures your brain."). The Court is unconvinced this disagreement impeaches Dr. Williams's methodology or precludes introduction of that methodology at trial.

Carnival contends the study's usefulness is diminished because only nine of the 100 hundred cases concerned players who struck their heads with the ground and because a majority of the players suffered impacts to the temporal regions of their heads. Here, Berner struck his head with the floor—thus placing him in the minority of the cases in the study—and whether

Berner suffered impact to his temporal region is unknown. Nevertheless, the study gives a general range at which concussions occurred (36–44 lb-ft); it does not except head-to-ground impacts from this range, nor does it apply only to temporal strikes. *See* McIntosh, et al., *supra,* at 1983. And the study accounts for occipital impacts as well. *See id.* Furthermore, the article fully explains the method used in concluding the range at which concussions occurred. *See id.* at 1980–83. The accuracy of aspects of the study suggests a certain reliability. *See id.* at 1982 ("The accuracy of the initial speed estimates are within 10% of the actual speeds ...."); *see also id.* at 1983 ("[T]he general trends in the relationship between injury and impact velocity or energy are consistent [with another study].") The study, which appears in an article published in a journal of repute, may be subjected to peer review. *See Kumho,* 526 U.S. at 141, 119 S.Ct. 1167.

Dr. Williams's conclusions are not merely an *ipse dixit,* as Carnival contends. Rather, Dr. Williams uses well-reasoned and established methodologies to conclude that the impact energy on Berner's head on striking the ground was sufficient to cause a mild to moderate traumatic brain injury. Carnival may explore differences between the study and this case on cross-examination. The Court must ensure that expert testimony is both relevant and reliable, *see Kumho,* 526 U.S. at 141, 119 S.Ct. 1167, and Berner has shown both with regard to Dr. Williams's testimony.[2]

### III. CONCLUSION

For the reasons herein, it is

---

**2.** Because the level of force sufficient to cause a brain injury is "beyond the understanding of the average lay person," *Frazier,* 387 F.3d at 1262, expert testimony on this point is relevant.

**ORDERED AND ADJUDGED** that Defendant's Motion to Exclude Expert Testimony of Jamie Williams, Ph.D. [D.E. 124] is **DENIED**.