Walter GASTALDI, et al., Plaintiffs,

v.

SUNVEST RESORT COMMUNITIES, LC, et al., Defendants.

Case No. 08–62076–CIV.

United States District Court, S.D. Florida, Miami Division.

March 4, 2010.

---

Gail Ann McQuilkin, Harley Shepard Tropin, Adam M. Moskowitz, Kozyak Tropin & Throckmorton, Coral Gables, FL, Chris W. Cantrell, Keith T. Belt, Jr., Belt Law Firm, Birmingham, AL, for Plaintiffs.

Haas A. Hatic, Rebecca Faith Bratter, Richard Wayne Epstein, Greenspoon Marder Hirschfeld Rafkin Ross & Berger, Fort Lauderdale, FL, Gregory J. Trask, Peter W. Homer, Homer Bonner, P.A., Miami, FL, Andrew M. Genser, Atif Khawaja, Jonathan Putnam, Ryan M. Morettini, Sandra L. Musumeci, Kirkland & Ellis LLP, New York, NY, for Defendants.

### ORDER

CECILIA M. ALTONAGA, District Judge.

**THIS CAUSE** came before the Court on the Defendant, IMG Academies, LLP's ("IMGA['s]") Omnibus Motion *in Limine* [D.E. 215], filed January 6, 2010. The Omnibus Motion is made up of seven separate motions *in limine*, six of which the Court ruled on at a hearing on February 9, 2010. Because of the complexity and importance of the issues involved, the Court reserved ruling, however, on Motion *in Limine* No. 1 (the "Motion"), which seeks to preclude evidence of or argument on any of the Plaintiffs' damages models disclosed by the Plaintiffs' expert, Michael O'Rourke. The Court requested, and the parties have submitted, additional briefing on the issue.

O'Rourke has produced four damages reports in all, each of which purports to calculate the Plaintiffs' alleged damages under the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), §§ 501.201–501.213, Florida Statutes. The Court will focus the analysis here on O'Rourke's fourth and final report, considered by the Plaintiffs to be "his operative report." (Pls.' Resps. in Opp'n [D.E. 224] 9 n. 9). Moreover, O'Rourke's final report is the subject of the bulk of the parties' arguments.[1]

In his fourth report, O'Rourke calculates the Plaintiffs' alleged damages as follows:

---

1. IMGA seeks to exclude O'Rourke's first three reports on the ground that they do not take into account the decline in the real-estate market. (*See* Mot. 13).

I have calculated each Plaintiff's FDUP-TA [sic] violation damages as the difference in the market value of the unit in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the representations in the marketing and sales materials. *See Stires v. Carnival Corp.,* [No. 6:02–cv–542–ORL31JGG] 2003 WL 21356781 (M.D.Fla. [Jan. 2, 2003] ). The condition the unit should have been delivered in is a luxury condominium within a 5 star resort with world class amenities and IMG Academies sports training facility and complex. The market value in the condition in which it should have been delivered was calculated by adding the purchase price and mandatory club membership fee paid at closing. The market value of the unit in the condition it was delivered was based on the current appraised market value reported by Greater Orlando Appraisal Association, Inc. adjusted to account for the market decline reported by Louis G. Dudney, CPA.

As shown in Exhibit 1, attached to this report, I have calculated FDUPTA [sic] damages on the date of closing by subtracting the total market value of the unit in the condition delivered from the total market value in the condition in which it should have been delivered. Collectively, the total damage under the FDUPTA [sic] claims for all Plaintiffs in the Trial Group is [$8,323,987 less $2,197,402] which equals $6,126,585.

(EXPERT REPORT OF MICHAEL F. O'ROURKE, CPA (REVISED) (Nov. 13, 2009) [D.E. 215–4] 2–3).

IMGA seeks to exclude the report on the principal ground that O'Rourke did not account for the undisputed 66 percent decline in the value of the real-estate market

in Orlando from 2006–2007, the time period during which the Plaintiffs bought their units, and two years hence, when the units were supposed to be "delivered" as marketed. (*See* Mot. 11–12). Because of this, IMGA contends if O'Rourke's model is accepted, the Plaintiffs would be compensated for losses traceable not to the alleged misconduct of IMGA, but to "the greatest real estate market decline in generations, an improper calculation that would, at IMGA's expense, put the Plaintiffs in a much better position than they would have been in had there been no alleged FDUT-PA violation." (*Id.* 2). If what IMGA says is true, O'Rourke's damages model would give the Plaintiffs a "windfall," which is forbidden by law. *See MCI Worldcom Network Servs., Inc. v. Mastec, Inc.,* 995 So.2d 221, 224 (Fla.2008); 22 AM.JUR.2D *Damages* § 28 (West 2009).

O'Rourke's first three reports did not consider the real-estate decline. (*See* Mot. 13). But after reviewing Dudney's rebuttal-expert report (*see* REBUTTAL EXPERT REPORT OF LOUIS G. DUDNEY, CPA (Oct. 30, 2009) [D.E. 212–4] ), and conferring with counsel for IMGA, the Plaintiffs offered "an alternative damage assessment which simply set the delivery date under FDUT-PA as the time of closing instead of the date after the approximate two year lease back period expired," (Pls.' Resps. in Opp'n 9). In the fourth report, O'Rourke calculated the "true value of the units at the time of the closings in 2006" by "simply t[aking] the current agreed appraisals and multipl[ying] them by IMGA's own real estate decline figures." (*Id.*).

O'Rourke does not, as IMGA notes in reply (*see* Def.'s Reply [D.E. 234] 2–6] ), apply the 66 percent market decline to the *entire* purchase price; O'Rourke applies the market decline only to the portion of the purchase price supposedly representing the value of the pre-renovated unit.[2]

---

**2.** As a simple example, given a 70 percent market decline since 2006 through 2009, a

IMGA contends any proper model must apply the decline to the entire purchase price because the units would only be delivered (to borrow a metaphor from oral argument) with all the "bells and whistles" two years later. The Plaintiffs disagree. "This case presents a classic situation of dueling experts who agree in principle to the measure of damages (the difference in value between what Plaintiffs paid for and what they received) but who disagree on the facts that should be considered when calculating the damages." (Pls.' Supplemental Mem. [D.E. 249] 1–2).[3]

The admissibility of O'Rourke's expert testimony and the reports depends on whether they conform with the Federal Rules of Evidence and Florida law on damages. Federal Rule of Evidence 702, which governs expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

█ Rule 702 requires courts to ensure "that proffered expert testimony is both reliable and relevant." *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir.2009) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579,

589–92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). "This function inherently requires the trial court to conduct an exacting analysis of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004) (alterations and internal quotation marks omitted).

█ As the "gatekeepers," courts must conduct a three-part inquiry into whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the applications of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). In deciding whether a specific methodology is reliable, courts may consider whether the methodology can be and has been tested; whether the methodology has been subjected to peer review and publication; the known or potential rate of error and the existence and maintenance of standards controlling operation of the methodology; and whether the methodology has gained general acceptance in the scientific community. *See Berner v. Carnival Corp.*, 632 F.Supp.2d 1208, 1210–11 (S.D.Fla.2009) (citing *Daubert*, 509 U.S. at

---

unit worth $30,000 in 2009 would have been worth $100,000 in 2006. O'Rourke would then subtract the $100,000 from the entire purchase price to calculate the damages.

**3.** The Plaintiffs also seek to exclude the testimony of Dudney, who believes O'Rourke should consider in his calculations "the hypo-

thetical value of the units had the property been developed into an IMGA sports academy, reduce the value by the decline in value for condominium conversions, and then calculate the damages two years later rather than at closing." (Pls.' Supplemental Mem. 3). Any such valuations, the Plaintiffs contend, are speculative.

593–94, 113 S.Ct. 2786, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). The inquiry is " 'a flexible one,' and the focus 'must be solely on principles and methodology, not on the conclusions that they generate.' " *Id.* at 1211 (quoting *Daubert*, 509 U.S. at 594, 595, 113 S.Ct. 2786). The proponent of the expert testimony bears the burden of its admissibility. *See id.* (citing *Frazier*, 387 F.3d at 1260).

■ Methodologically flawed expert reports may be excluded under *Daubert*, *see Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250–51 (11th Cir.2007), including flawed expert reports on damages, *see In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F.Supp.2d 1005, 1016 (C.D.Cal.2003); *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F.Supp. 1021, 1023–28 (S.D.N.Y.1997); *Morgan Stanley & Co. Inc. v. Coleman (Parent) Holdings, Inc.*, 955 So.2d 1124, 1131 (Fla. 4th DCA 2007).

■ These governing principles apply to the admissibility of O'Rourke's proffered testimony and his report, which, according to the Plaintiffs, properly calculate their measure of damages under the FDUTPA. Thereunder, damages are calculated by taking "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. 3d DCA 1984); *accord Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 453 (5th Cir.2001) (Florida law); *Stires v. Carnival Corp.*, 243 F.Supp.2d 1313, 1322 (M.D.Fla.2002); *H & J Paving of Fla., Inc. v. Nextel, Inc.*,

849 So.2d 1099, 1101 (Fla. 3d DCA 2003); *Ft. Lauderdale Lincoln Mercury, Inc. v. Corgnati*, 715 So.2d 311, 314 (Fla. 4th DCA 1998). "While the Florida DUTPA cases do not use the phrase 'benefit of the bargain' in describing this damages formula, the two are clearly synonymous: the value of the product as promised minus the value of the product delivered." *Coghlan*, 240 F.3d at 453; *see also Morgan Stanley*, 955 So.2d at 1128 ("Damages under the benefit-of-the-bargain rule are measured by the difference between the value of the property as represented and the actual value of the property on the date of the transaction.").

■ With these principles in mind, the Court examines O'Rourke's report. O'Rourke measured the Plaintiffs' damages by taking "the difference in the market value of the unit in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the representations in the marketing and sales materials." [4] (O'ROURKE REPORT 2). In the next sentence he states, "The condition the unit should have been delivered in is a luxury condominium within a 5 star resort with world class amenities and IMG Academies sports training facility and complex." (*Id.*). The Court pauses here to observe the critical and undisputed fact that, "according to the representations in the marketing and sales materials," and the Plaintiffs' understandings and allegations, the units would only have been "delivered" in this condition approximately two years after their purchase; at closing the units were not renovated and there was no sports academy. (*See* O'Rourke Dep.

---

4. Although *Stires*, the case cited in the report, uses the language, "according to the contract of the parties," 2003 WL 21356781, at *2 (quoting *Corgnati*, 715 So.2d at 314), O'Rourke did not consider the purchase-and-sale agreements in his calculations (*see*

O'Rourke Dep. 38:6–15, Dec. 15, 2009). Rather, as stated, O'Rourke used the condition in which the units should have been delivered "according to the representations in the marketing and sales materials."

96:11–13). Moving on, O'Rourke states, "The market value in the condition in which it should have been delivered was calculated by adding the purchase price and mandatory club membership fee paid at closing." (O'ROURKE REPORT 2–3). Putting the club-membership fee to the side, the consequence of what O'Rourke is saying is that the price the Plaintiffs paid for the units in 2006–2007 equals the market value of the units that were supposed to have been "delivered" in 2009.

O'Rourke does not explain, however, *how* he arrives at this conclusion, apart from the general statement that "what the[ ] [Plaintiffs] purchased was a completed unit, which had not yet been completed." (O'Rourke Dep. 49:15–17). In other words, he provides no methodology explaining how he concludes that the *purchase price* of the units in 2006–2007 is the same as the *market value* the units would have had in 2009 if they had been completed as marketed.[5] In those two years the Orlando real-estate market declined in value by 66 percent. But O'Rourke does not consider whether this decline—or any other intervening factors, for that matter—may have affected the market value of the units if they had been "delivered" as promised. Again, it is undisputed that the units would only have been "delivered" as bells-and-whistles units two years after the Plaintiffs bought them. (*See id.* 48:18–51:15; 96:8–13).

The Plaintiffs say such a calculation would be speculative. (*See* Hr'g Tr. 34:12–19; O'Rourke Dep. 116:25–117:14). But a speculative calculation is exactly the one O'Rourke makes. O'Rourke asserts the market value of the condition in which the units should have been delivered—*i.e.,* with all the bells and whistles, according to him—equals what the Plaintiffs paid for them in 2006–2007. Yet, the units would only have been "delivered" as such two years later, and O'Rourke does not explain *at all* how the purchase price of the units in 2006–2007 equals the market value of the units in 2009. Nor does his report rely on facts or data of what a fully renovated unit would have been worth in 2009. *See* FED.R.EVID. 702; *Frazier*, 387 F.3d at 1261–62 ("[T]he trial judge must assess ... whether the reasoning or methodology properly can be applied to the facts in issue." (alteration and internal quotation marks omitted)).

IMGA is correct that, if Orlando Cay Clubs had been realized, the market value of the Plaintiffs' units may have been less than the purchase price, and thus the difference between the market value of the units as they should have been delivered and the market value of the units as they were delivered may have been less as well. Due to the undisputed real-estate decline over the two year period, the real possibility of a forbidden windfall exists. *See MCI Worldcom*, 995 So.2d at 224; *Damages,*

**5.** The Plaintiffs have, at times, referred to the measure of damages in FDUTPA as, for example, "the difference in value between what Plaintiffs paid for and what they received." (Pls.' Supplemental Mem. 1–2; Pls.' Omnibus Motions *In Limine* [D.E. 212] 15 ("The condition in which the unit should have been delivered (*i.e.,* the total purchase price of the unit) (bold omitted)); *see also* Hr'g Tr. 33:10–11, Feb. 9, 2010 ("Under FDUTPA, the damages, as stated and everyone agrees, is what was *paid* first, what was received, period." (emphasis added))). To be clear, however, the inquiry concerns the *market value* of the condition in which the units were delivered and the *market value* of the condition in which the units should have been delivered. *See Heller*, 454 So.2d at 585. The Court notes this parenthetically because it is not accurate to state that the Plaintiffs and IMGA agree on the proper measure of damages. Indeed, it is chiefly over whether the purchase price equals the market value of the condition of the units as they should have been delivered that the parties disagree.

*supra,* § 28. Faced with no adequate explanation in the report, deposition, or at oral argument, the Court can only conclude that the Plaintiffs have failed to meet their burden of establishing the reliability of the methodology O'Rourke uses in determining the market value of the units in the condition in which they should have been delivered. "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" FED. R.EVID. 702 advisory committee's note (citing *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1319 (9th Cir.1995), and *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090 (7th Cir.1994)).[6]

This conclusion, which the Court does not make lightly, raises the question of what the correct measure of damages may be in this case, which appears to be unique among FDUTPA cases owing to the buy-now-receive-later nature of the transaction. Indeed, a clearly defined "delivery" date is present in most cases brought under the FDUTPA. But here the Plaintiffs bought prerenovated units in 2006–2007 and a promise that the units would be delivered with all the bells and whistles in 2009. This perhaps explains why O'Rourke states that the delivery date he used in his report is the closing date (*see* O'ROURKE'S REPORT 2; Pls.' Supplemental Mem. 7); yet, in the very next line, he conflates the purchase price with the market value of a unit that would only be "delivered" according to the marketing and sales materials two years later.

■ A person who has suffered a loss as a result of a violation of the FDUTPA "may recover actual damages." FLA. STAT. § 501.211(2). As quoted, the standard for determining actual damages is well-defined:

> [T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties. A notable exception to the rule may exist when the product is rendered valueless as a result of the defect—then the purchase price is the appropriate measure of actual damages.

*Heller,* 454 So.2d at 585 (quoting *Raye v. Fred Oakley Motors, Inc.,* 646 S.W.2d 288, 290 (Tex.Ct.App.1983)). Notably nothing in the statute or in the ubiquitous standard of *Heller* requires the "delivery" date to be the same as the date of the sale. That the date of the sale is often the delivery date for purposes of measuring damages in most of the reported FDUTPA cases proves only that goods, which end up as the subjects of FDUTPA cases, usually exchange hands on the date of the sale. *E.g., Coghlan,* 240 F.3d at 451 (boat); *Collins v. DaimlerChrysler Corp.,* 894 So.2d 988, 989 (Fla. 5th DCA 2004) (Chrysler automobile); *Nextel,* 849 So.2d at 1100 (radio system); *Davis v. Powertel, Inc.,* 776 So.2d 971, 972–73 (Fla. 1st DCA 2000) (cell phones); *Corgnati,* 715 So.2d at 312 (BMW automobile). This case is different because although the Plaintiffs bought the units in 2006–2007, those in charge of "delivering" the units as Orlando Cay Clubs units would do so only in 2009.

The gravamen of the Plaintiffs' allegations is that "the Defendants, contrary to their representations, didn't follow through

---

**6.** Noting that, according to Dudney's rebuttal-expert report, one unit at IMGA's Bradenton campus sold in 2009 for $600,000, the Plaintiffs also say it is possible the market value would have risen in those two years because this was no ordinary condo-conversion project—IMGA's involvement added serious value to the project. But O'Rourke's report does not incorporate this fact into its calculations. The same goes for characterizing the units as "income-producing units." The report does not take that into account either.

with the restoration of the Project, the conversion or the sporting facility, leaving the Plaintiffs with 'un-refurbished residential units in a low-end abandoned moldy bug and rodent infested apartment complex.'" *Gastaldi v. Sunvest Resort Cmtys., LC*, No. 08–62076–CIV, 2010 WL 457243, at *1 (S.D.Fla. Feb. 3, 2010) (citation and some internal quotation marks omitted) (quoting Second Am. Compl. [D.E. 188] ¶ 242). These allegations would be consistent with regarding the "delivery date" as approximately two years after the purchase, when the units were supposed to have been completed as marketed. The FDUTPA damages equation thus becomes straightforward: the difference in the market value of the units in the condition in which they were delivered in 2009 and the market value of the units if Orlando Cay Clubs had been completed as marketed, *also in 2009*. Apart from being consistent with the Plaintiffs' allegations, this approach is conceptually easier to understand as well—the Plaintiffs were allegedly promised units with all the bells and whistles, but that is not what the Plaintiffs got. *See also Coghlan*, 240 F.3d at 453 ("[T]he value of the product as promised minus the value of the product delivered."); *Stires*, 2003 WL 21356781, at *2 (holding that the plaintiff properly alleged as damages the difference between the value of the cruise "promised and advertised" and "the value of the cruise she received"). The Court is not unmindful of the Plaintiffs' concern that such a calculation is speculative (although there is a possibility the units could be compared with those at IMGA's Bradenton campus (*see* Pls.' Supplemental Mem. 6)). But if the Plaintiffs are going to define, as O'Rourke has done, the market value of the units in the condition in which they should have been delivered as the bells-and-whistles units, then this is the method by which to calculate damages.

If, however, the Plaintiffs define the delivery date as the closing date, then *H &*

*J Paving of Florida, Inc. v. Nextel, Inc.*, 849 So.2d 1099 (Fla. 3d DCA 2003), cited by the Plaintiffs, is instructive because it contains similar facts. In that case two corporations bought radio-communication systems from Nextel. The corporations asserted Nextel did not inform them before they bought the systems that Nextel would be discontinuing radio service in the corporations' area, rendering the systems obsolete. The court granted summary judgment for Nextel, partially on the ground that one of the corporations did not suffer damages. Finding disputed issues of fact, the appellate court reversed and, citing the *Heller* standard, instructed how to measure damages properly in the case.

> In the light most favorable to [the corporations], the record on appeal indicates that when the analog radio communication system and the add-on radio were delivered, [the corporations] were told that these products would be functional for approximately eight years. Under such a scenario, the correct measure of damages, as to both [corporations], would be the value of the products at the time of sale based upon a useful life of approximately eight years and the value of the product which would become obsolete within a few years.

*Id.* at 1102. This measure of damages would have put the corporations in the position they would have been in but for the deception because it calculates the deception-free value of the systems when the corporations bought them.

Nextel is not unlike this case. The Plaintiffs allege IMGA and Sunvest promised to convert the property into Orlando Cay Clubs (*see* Second Am. Compl. ¶ 236); that the Defendants "knew it was unlikely" that Orlando Cay Clubs would be built but did not disclose this fact to prospective buyers (*see id.* ¶ 240); and that the Defen-

dants were partners with themselves and with Cay Clubs (*see id.* ¶¶ 243, 267). At bottom the Plaintiffs allege the Defendants and Cay Clubs did not disclose their ability or desire to make Orlando Cay Clubs a reality. On closing the Plaintiffs paid approximately $350,000 each for unrenovated units that encompassed the promise that they would be converted and a sports academy would be built, and that all of the representations of the Defendants and Cay Clubs were true. *That* is the "condition" in which the units should have been delivered on closing; not, as O'Rourke's report asserts, as bells-and-whistles units. But on closing the Plaintiffs did not get that. For example, IMGA was not in a partnership with Cay Clubs; it was in a consulting arrangement with Cay Clubs. IMGA was not obligated to build the sports academy; DC720JV, LLC was.

Under *Nextel,* therefore, the correct measure of damages would be the difference between the value of the units on closing based on the expectation that they would be completed as marketed in 2009 and assuming the truth of the alleged deception of the Defendants and Cay Clubs—presumably what the Plaintiffs paid for them—and the value of the units at the time of the sale without the alleged deception. In this regard, the case begins to look more like a securities-fraud case, which uses both the benefit-of-the-bargain rule (like the FDUTPA), and the out-of-pocket rule. *See Morgan Stanley,* 955 So.2d at 1131 ("Florida law ... requires the plaintiff to prove the actual, 'fraud-free' value of the stock at the time of purchase."); *Totale, Inc. v. Smith,* 877 So.2d 813, 815 (Fla. 4th DCA 2004) (same). Furthermore, the focus in securities-fraud cases, like O'Rourke purports to have done here, is at the time of the *purchase. See Totale,* 877 So.2d at 815 (citing *Strickland v. Muir,* 198 So.2d 49, 51 (Fla. 4th DCA 1967), *disagreed with on other grounds, Teca, Inc. v. WM–TAB, Inc.,* 726 So.2d

828, 830 (Fla. 4th DCA 1999) (en banc)). So giving the Plaintiffs the benefit of the bargain, at closing the Plaintiffs would have received an allegedly much stronger investment (albeit not one without risks) due in large part to their alleged understanding of IMGA's and Sunvest's involvement in the project. The market value of that investment at the time of the sale was presumably what they paid for it. Yet what the Plaintiffs actually received was an investment that was much riskier because the Defendants were not as involved as they allegedly represented, because certain plans and permits had allegedly not been made or secured, and because no Defendant was legally obligated to bring Orlando Cay Clubs to a conclusion. Presumably the market value of that investment—knowing, for example, that IMGA and Cay Clubs were not partners and that DC720JV, LLC, not IMGA, was obligated to build the sports academy, *see Gastaldi,* 2010 WL 457243, at *3–7—was worth less.

\* \* \*

■ O'Rourke's report is clear. He states he calculated each Plaintiff's damages by taking the difference in the market value of the unit in the condition in which it was delivered and the condition in which it should have been delivered according to the marketing and sales materials. He states the unit should have been delivered with all the bells and whistles, which undisputedly was supposed to occur only in 2009. He then states the market value of the unit in the condition in which it should have been delivered (in 2009) was the purchase price which was paid at closing (in 2006–2007). Yet this conclusion is not based on sufficient facts or data, *see* FED.R.EVID. 702, and he provides no reason, explanation, or methodology showing how or why this is so. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

evidence which is connected to existing data only by the *ipse dixit* of the expert." *Mich. Millers Mut. Ins. Corp. v. Benfield,* 140 F.3d 915, 921 (11th Cir.1998) (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (alterations and internal quotation marks omitted)).

For these reasons, it is

**ORDERED AND ADJUDGED** that the Motion is **GRANTED.**